***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Holmes, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award, except for minor modifications. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner on 5 June 2001 as:
 STIPULATIONS
1. The plaintiff-Employee worked for Cone Mills, in Salisbury, North Carolina from 1968 until 1993.
2. Defendant Cone Mills was insured from January 1, 1969 until January 1, 1978 by Liberty Mutual Insurance Company for workers' compensation. From 1978 until the plaintiff retired in 1993, Cone Mills was self-insured.
3. The parties are subject to the North Carolina Workers' Compensation Act.
 ***********
Based upon all the evidence adduced from the record, the undersigned makes the following additional:
 FINDINGS OF FACT
1. Dr. Stephen Proctor, a Salisbury pulmonologist, began treating the plaintiff in November, 1997. His initial assessment supported evidence of both interstitial fibrosis and an obstructive lung disease or asthma. He subsequently diagnosed and treated the plaintiff for asthma. A December 9, 1997 letter indicated that he diagnosed Mrs. Goodman with mild asbestosis, but that she also exhibited signs of dyspnea and other pulmonary problems not attributable to asbestos exposure. Dr. Proctor agreed that Mrs. Goodman had a history of rheumatoid arthritis, gastroesophageal reflux disease, and taking Macrodantin, all of which are known and accepted causes of interstitial fibrosis.
2. Dr. Proctor also reviewed Pulmonary Function Tests during his treatment of Mrs. Goodman. His 1997 tests demonstrated an obstructive lung defect. When the tests were repeated in March 2000, spirometry readings improved following the use of inhaler medication, providing additional evidence of asthma which Dr. Proctor had already diagnosed. The PFT's showed slight improvement in several areas between 1997 and 2000. Dr. Proctor testified the improvement was minimal, but he agreed that certain lung diseases, like asthma, could yield higher pulmonary functioning readings while asbestosis is a progressive disease and does not typically show similar improvements.
3. The plaintiff also introduced testimony from two radiologists, Dr. Frederick Dula and Dr. Caroline Chiles. Dr. Dula testified that he reviewed a CT scan of Mrs. Goodman from March 2000, noting interstitial changes in both lungs and small pleural plaques in several locations. His B read of films from the same date indicated the presence of small opacities in the mid and lower lung zones on both sides in a profusion of 1 over 1. However, he found no pleural abnormalities consistent with pneumoconiosis.
4. Dr. Dula testified that in the absence of pleural findings, there is no way to differentiate interstitial fibrosis caused by rheumatoid arthritis, gastroesophageal reflux, and Macrodantin exposure from interstitial fibrosis caused by asbestos exposure. Dr. Dula did report pleural findings, especially small pleural plaques in several locations, on his review of CT scans. He indicated that his impression of "consistent with asbestosis" is not the equivalent of a diagnosis of asbestosis, as he did not take or know the plaintiff's medical history or any facts related to her exposure to asbestos.
5. The plaintiff also called Dr. Caroline Chiles, a Winston-Salem radiologist. Like Dr. Dula, Dr. Chiles performed a B read interpretation of Mrs. Goodman's x-rays, finding small opacities in all lung zones in a profusion of 1 over 1. She also found no pleural changes consistent with pneumoconiosis. She reviewed two CT scans of Mrs. Goodman, in both the supine and prone position, but found no pleural abnormalities of any kind. On the other hand, she noted two small ganuloamas that were not in fact pleural plaques, but could be misinterpreted otherwise. Dr. Chiles indicated that her findings could represent asbestosis, if Mrs. Goodman had reliable history of asbestos exposure over the appropriate latency period. She agreed that her findings were also consistent with interstitial fibrosis caused by rheumatoid lung disease, reflux, or Macrodantin exposure.
6. A third radiologist, Dr. Michael Alexander, also read the plaintiff's films and was called as a witness by the defendants. Like Dr. Chiles, he reported finding the presence of small opacities in a profusion of 1 over 1 in all lung zones, but found no pleural abnormalities consistent with pneumoconiosis. He testified that the absence of pleural findings is critical to the determination of whether or not a patient has asbestosis. Dr. Alexander testified that the findings in this case showed no evidence of asbestosis or any pleural disease.
7. The defendants also called Raleigh pulmonologist Dr. Allen Hayes on the question of diagnosis and interpretation of the radiographic evidence. Dr. Hayes testified that his examination and review of x-rays and CT scans supported a finding of interstitial fibrosis consistent with mild pulmonary fibrosis. Mrs. Goodman's chest x-rays demonstrated the presence of irregular opacities in the four lower lung zones but no pleural abnormalities. Based on these findings, he testified, a diagnosis of asbestosis could not be confirmed without a tissue biopsy.
8. Dr. Hayes testified that other causes of interstitial fibrosis consistent with his findings included gastroesophageal reflux, drug toxicity, specifically to Macrodantin, and rheumatoid arthritis.
9. In addition to the medical experts, the parties also deposed two industrial hygienists. The plaintiff called Howard Cole of Dallas, Texas. Mr. Cole testified that the mere presence of asbestos in building materials does not pose a health risk, but he indicated that Mrs. Goodman would have been exposed to the hazard of airborne asbestos if damaged pipe adjacent to the spinning machine were "continuously subjected to compressed air." Mr. Cole did not visit the Cone Mills Salisbury facility or know the size of the room, the location of any piping, whether or how any insulation was encapsulated, its proximity to the spinning machines, or the frequency of use of compressed air by Cone employees.
10. The defendants called Dr. William L. Dyson of Greensboro on the subject of harmful and significant exposure to asbestos. Dr. Dyson provided a brief background on asbestos minerals, including a description of different classes, its advantages to industry, and the potential health hazards related to asbestos exposure. The health hazards, namely asbestosis, asbestos related lung cancer, and mesothelioma, require exposure to high levels of asbestos fibers for a long duration.
11. According to Dr. Dyson, certain activities are generally accepted as exposing the worker to high levels of asbestos exposure. These include the use of asbestos as a raw material, as in early twentieth century textile work, mining asbestos minerals, and insulation work in confirmed spaces, as on board ships. Exposure in Mrs. Goodman's case, however, from the presence of building materials and steam pipe insulation, is 50 to 100 times lower than the maximum standard for the presence of airborne asbestos set by OSHA. Dr. Dyson also based his opinion on his familiarity with Cone Mills itself, both during his private practice as an industrial hygienist and during a subsequent visit to the facility where Mrs. Goodman worked. Given these studies, he testified, Cone Mills was not required by OSHA to conduct initial air monitoring.
12. Dr. Dyson then discussed this information in the contest of epidemiological studies on asbestos exposure. These studies analyze the development of asbestosis in terms of "fiber years," or the product of the time weighted average (the ratio of asbestos fibers per cc of air) multiplied by the number of years of exposure at that level. Based on these studies, he concluded and testified that Mrs. Goodman was not at risk for developing asbestosis based on any exposure during her employment at Cone Mills.
13. The testimony of Dr. Dyson on the subject of increased risk is not given weight by the Full Commission. Dr. Dyson is a PhD., not a medical Doctor, and has education in chemical engineering and environmental health engineering. He has a professional background in industrial hygene. Because Dr. Dyson is not a medical doctor with a background in asbestosis diagnosis and treatment, he is not a qualified expert on the subject of asbestosis and/or pleural plaque development and causation.
14. Through cross-examination and other testimony, the plaintiff attempts to counter Dr. Dyson with testimony that company "blow-offs" and "blow-downs" produced a greater level of exposure than the mere presence of asbestos in building materials. The plaintiff contends that the use of compressed air on damaged insulation would have released millions of asbestos fibers into the air.
15. Testimony as to what damage was done to the pipe insulation in the defendant-employer's plant is conflicting.
16. The plaintiff left employment with the defendant-employer in 1993 and has worked at various jobs subsequent to said date. Most recently she has worked at Gentiva Health Services as an in-home health care giver earning $6.75 per hour for 32 hours per week. The plaintiff also cleans her Church on Saturdays, earning $100.00 for that day of work. In addition, the plaintiff receives social security.
17. During her employment with defendant-employer, the plaintiff did not directly handle asbestos or asbestos containing materials.
18. When the plaintiff began work for defendant-employer, she worked in the spinning department.
19. During her employment, the plaintiff participated in periodic "blow-downs" and daily "blow-offs" by using compressed air. This was done to reduce the risk of fire and to keep the spinning equipment clean. Using compressed air in this manner is unlikely to cause significant damage to insulation that covered the steam pipes in defendant-employer's plant.
20. The spinning room where the plaintiff worked was as large as a football field and had a 40-50 foot high ceiling. The testimony was that there were approximately five insulated steam pipes, three of which were covered by metal jacketing and two of which would have been covered by what is referred to as lag fast or a canvas cover painted surface. The purpose of the lag fast and metal jacketing on pipes is to maintain the integrity of the insulation beneath the covering and to aid cleaning the cotton lint and dust off the pipe surface.
21. From 1968 through 1970, the plaintiff worked as part of a weekend cleanup crew, approximately one time every six weeks she was a sweeper during blowdowns. From 1968 through 1975, she allegedly blew off a damaged area of pipe insulation on a pipe that ran vertically by the women's restroom. According to the plaintiff's testimony this vertical pipe had a 3 inch by 6 inch damaged area of insulation on it, approximately four feet above the ground which was never repaired, and other damage from being bumped by doff and creel carts. Other witnesses indicated that damaged pipe insulation was promptly repaired.
22. All of the credible evidence indicates there was little, if any, asbestos-containing material used in the spinning room at defendant-employer. All asbestos, if any, would have been encapsulated steam pipe insulation, so that respirable asbestos fibers would not have been in the air from that source unless there was damage to the insulation.
23. The testifying physicians agree that the plaintiff's physical and radiology exams reveal pulmonary fibrosis.
24. In making his diagnosis, Dr. Proctor reviewed radiology reports from Dr. Dula that showed small pleural plaques in several locations. However, the other three doctors observed only pleural abnormalities.
25. The plaintiff's medical records and history support findings of rheumatoid arthritis, gastro-esophageal reflux disease, and exposure to the drug macrodantin. All of the above may be causes of the plaintiff's interstitial lung disease or pulmonary fibrosis.
26. The diagnosis of asbestosis requires a reliable history of exposure and an appropriate latency between the exposure and the disease of 15 years or more.
27. The plaintiff spent her entire career with defendant-employer working in the spinning room. The only asbestos-containing material would be in the steam pipe insulation. However, much of the time that the plaintiff worked with the defendant-employer, the pipe insulation was covered with metal jackets or lag fast, which is a painted canvas covering used to maintain the integrity of the underlying material and to aid in clean up. Testimony is conflicting as to how much damage was done to the insulation.
28. According to defendant-employer's asbestos-containing materials inventory, the only area of the spinning room that might have asbestos-containing material was a length of pipe insulation.
29. The plaintiff was not "removed" from her employment by an order of the North Carolina Industrial Commission after any diagnosis of asbestosis.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
The plaintiff has failed to show by the greater weight of the evidence that she contracted the occupational disease of asbestosis as a result of her employment with the defendant-employer. N.C.G.S. § 97-53(24).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. The plaintiff's claim under the law must be and the same is hereby DENIED.
2. Each side shall pay its own costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER